No. 17-15589

IN THE

# United States Court of Appeals for the Ninth Circuit

STATE OF HAWAII, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Hawaii, No. 1:17-cv-00050-DKW-KSC
District Judge Derrick K. Watson

## BRIEF FOR PLAINTIFFS-APPELLEES


DOUGLAS S. CHIN
Attorney General of the State of Hawaii
CLYDE J. WADSWORTH
Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA
DONNA H. KALAMA
KIMBERLY T. GUIDRY
ROBERT T. NAKATSUJI
Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813

*Counsel for the State of Hawaii*

NEAL KUMAR KATYAL
COLLEEN ROH SINZDAK
MITCHELL P. REICH
ELIZABETH HAGERTY
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Email: neal.katyal@hoganlovells.com

THOMAS P. SCHMIDT
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

*Counsel for Plaintiffs-Appellees*


April 21, 2017

*(Additional Counsel Listed on Inside Cover)*

SARA SOLOW
ALEXANDER B. BOWERMAN
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................3

A. The First Executive Order ...........................................................3

B. The Second Executive Order .......................................................6

C. Procedural History ......................................................................8

SUMMARY OF ARGUMENT ......................................................................10

ARGUMENT ................................................................................................13

I. The Court Has Jurisdiction To Review The Executive Order ................13

A. Dr. Elshikh Has Standing ..........................................................14

B. Hawaii Has Standing ..................................................................17

C. The Government's Remaining Arguments Against Jurisdiction Are Meritless ..........................................................21

II. The Order Is Unlawful. .....................................................................23

A. The Constitution Entrusts the Immigration Power to Congress in Order to Protect Liberty ...........................................23

B. The Order Exceeds the President's Delegated Authority ..................................................................................26

1. The President lacks the limitless suspension power he claims ..................................................................26

2. The Order violates section 1152(a)(1)(A) ..........................30

3. The Order contradicts section 1182(a)(3)(B).....................32

## TABLE OF CONTENTS—Continued

**Page**


4. The Order contravenes Congress's specific judgment as to whether the covered aliens are "detrimental to the interests of the United States" ... 34

5. The Order's dragnet ban is irreconcilable with the policies of the immigration laws ... 37

C. The Order Violates the Establishment Clause ... 42

1. *Mandel* does not apply ... 43

2. The Establishment Clause prohibits the government from enacting policy to denigrate and burden adherents of a religion ... 47

3. The Order violates Establishment Clause limits ... 49

4. Defendants offer no convincing defense of the Order ... 51

D. The Order Violates Due Process ... 57

III. The Full Scope Of The Injunction Should Be Affirmed ... 59

CONCLUSION ... 61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Abdullah* v. *INS*,
184 F.3d 158 (2d Cir. 1999)....................................................................38

*Abourezk* v. *Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) .................................................................. 29

*AFL-CIO* v. *Am. Petroleum Inst.*,
448 U.S. 607 (1980)....................................................................................28

*Allende* v. *Shultz*,
845 F.2d 1111 (1st Cir. 1988) .............................................................. 29, 34

*Arizona* v. *United States*,
132 S. Ct. 2492 (2012)................................................................................23

*Bertrand* v. *Sava*,
684 F.2d 204 (2d Cir. 1982)........................................................................38

*Bridges* v. *Wixon*,
326 U.S. 135 (1945).................................................................................... 40

*Cardenas* v. *United States*,
826 F.3d 1164 (9th Cir. 2016)....................................................................46

*Carlson* v. *Landon*,
342 U.S. 524 (1952)........................................................................24, 27, 29, 30

*Catholic League for Religious & Civil Rights* v. *City & Cty. Of S.F.*,
624 F.3d 1043 (9th Cir. 2010)...........................................................14, 15, 16

*Chadha* v. *INS*,
634 F.2d 408 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983)...............................38

*Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
508 U.S. 520 (1993)...............................................................................*passim*

*Cty. of Allegheny* v. *ACLU*,
492 U.S. 573 (2014)....................................................................................54

**Page(s)**

*City of Sausalito* v. *O'Neill*,
386 F.3d 1186 (9th Cir. 2004)....................19

*Clinton* v. *City of N.Y.*,
524 U.S. 417 (1998)....................16, 24, 27

*Clinton* v. *Jones*,
520 U.S. 681 (1997)....................46

*Colo. River Indian Tribes* v. *Town of Parker*,
776 F.2d 846 (9th Cir. 1985)....................19

*Czyzewski* v. *Jevic Holding Corp.*,
137 S. Ct. 973 (2017)....................20, 39

*Dada* v. *Mukasey*,
554 U.S. 1 (2008)....................31

*Delgadillo* v. *Carmichael*,
332 U.S. 388 (1947)....................29

*EC Terms of Years Tr.* v. *United States*,
550 U.S. 429 (2007)....................29, 34

*Engel* v. *Vitale*,
370 U.S. 421 (1962)....................24

*Everson* v. *Bd. of Ed. of Ewing Tp.*,
330 U.S. 1 (1947)....................48

*Fiallo* v. *Bell*,
430 U.S. 787 (1977)....................24

*Franklin* v. *Massachusetts*,
505 U.S. 788 (1992)....................60

*Galvan* v. *Press*,
347 U.S. 522 (1954)....................23, 43

**Page(s)**

*Gratz* v. *Bollinger*,
539 U.S. 244 (2003)....................16

*INS* v. *Chadha*,
462 U.S. 919 (1983)....................24, 42

*INS* v. *Nat'l Ctr. For Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)....................27, 29

*In re Reyes*,
910 F.2d 611 (9th Cir. 1990)....................43

*Int'l Refugee Assistance Project*, v. *Trump*,
No. 17-1351 (4th Cir. Apr. 19, 2017)....................15

*Judulang* v. *Holder*,
565 U.S. 42 (2011)....................29, 37, 39

*Kerry* v. *Din*,
135 S. Ct. 2128 (2015)....................*passim*

*Kleindienst* v. *Mandel*,
408 U.S. 753 (1972)....................*passim*

*Kolender* v. *Lawson*,
461 U.S. 352 (1983)....................41

*LAVAS* v. *Dep't of State*,
45 F.3d 469 (D.C. Cir. 1995)....................30, 41

*Law* v. *Siegel*,
134 S. Ct. 1188 (2014)....................28

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
134 S. Ct. 1377 (2014)....................19, 20

*Li Hing of Hong Kong, Inc.* v. *Levin*,
800 F.2d 970 (9th Cir. 1986)....................22

**Page(s)**

*Locke* v. *Davey*,
540 U.S. 712 (2004)....................14

*Marx* v. *Gen Revenue Corp.*,
133 S. Ct. 1166 (2013)....................34

*Massachusetts* v. *EPA*,
549 U.S. 497 (2007)....................11, 17

*McCreary Cty.* v. *ACLU*,
545 U.S. 844 (2005)....................49, 53

*Morrison* v. *Olson*,
487 U.S. 654 (1988)....................25

*Nadarajah* v. *Gonzales*,
443 F.3d 1069 (9th Cir. 2006)....................46

*Narenji* v. *Civiletti*,
617 F.2d 745 (D.C. Cir. 1979) (per curiam)....................41

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc.* v. *Brown*,
567 F.3d 521 (9th Cir. 2009)....................13

*New Motor Vehicle Bd.* v. *Orrin W. Fox Co.*,
434 U.S. 1345 (1977)....................21

*Nixon* v. *Fitzgerald*,
457 U.S. 731 (1982)....................45

*NLRB* v. *Noel Canning*,
134 S. Ct. 2550 (2014)....................24

*Olsen* v. *Albright*,
990 F. Supp. 31 (D.D.C. 1997)....................38

*Pac. Shores Props., LLC* v. *City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013)....................53

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Preminger* v. *Peake*,
552 F.3d 757 (9th Cir. 2008) ........ 13

*Rajah* v. *Mukasey*,
544 F.3d 427 (2d Cir. 2008) ........ 41

*Reno* v. *Flores*,
507 U.S. 292 (1993) ........ 29

*Rosenberg* v. *Fleuti*,
374 U.S. 449 (1963) ........ 29

*Salazar* v. *Buono*,
559 U.S. 727 (2010) ........ 45, 53, 56

*Santa Fe Indep. Sch. Dist.* v. *Doe*,
530 U.S. 290 (2000) ........ 59

*Stormans, Inc.* v. *Wiesman*,
136 S. Ct. 2433 (2016) ........ 52

*Texas* v. *U.S.*,
809 F.3d 134,155 (2015) ........ 20, 61

*Town of Greece* v. *Galloway*,
134 S. Ct. 1811 (2014) (plurality opinion) ........ 47, 48, 53

*Trunk* v. *City of San Diego*,
660 F.3d 1091 (9th Cir. 2011) ........ 51

*U.S. ex rel. Knauff* v. *Shaughnessy*,
338 U.S. 537 (1950) ........ 25

*UARG* v. *EPA*,
134 S. Ct. 2427 (2014) ........ 28, 29

*United Dominion Indus.* v. *United States*,
532 U.S. 822 (2001) ........ 31

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States* v. *Barajas-Alvarado*,
655 F.3d 1077 (9th Cir. 2011)....................................................................57

*United States* v. *Morton Salt Co.*,
338 U.S. 632 (1950)......................................................................................56

*United States* v. *Witkovich*,
353 U.S. 194 (1957)......................................................................................30

*Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ...........................................15, 16

*Vasquez* v. *L.A. Cty.*,
487 F.3d 1246 (9th Cir. 2007)................................................................14, 15

*W. Va. State Bd. Of Educ.* v. *Barnette*,
319 U.S. 624 (1943)..................................................................................47, 49

*Washington* v. *Trump*,
2017 WL 2462040 (W.D. Wash. Feb. 3, 2017)......................................*passim*

*Washington* v. *Trump*,
847 F.3d 1159 (9th Cir. 2017)..............................................................*passim*

*Wauchope* v. *U.S. Dep't of State*,
985 F.2d 1407 (9th Cir. 1993)....................................................................46

*Whitman* v. *Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001)......................................................................................27

*Wong Wing Hang* v. *INS*,
360 F.2d 715 (2d Cir. 1966)........................................................................38

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
343 U.S. 579 (1952)......................................................................................25

*Zadyvdas* v. *Davis*,
533 U.S. 678 (2001)......................................................................................44

**Page(s)**

*Zelman* v. *Simmons-Harris*,
536 U.S. 639 (2002) ... 17

*Zemel* v. *Rusk*,
381 U.S. 1 (1965) ... 27

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. art. I, § 8, cl. 4 ... 23

Haw. Const. art. 1 ... 21

**STATUTES:**

8 U.S.C. § 1152(a) ... 31

8 U.S.C. § 1152(a)(1)(A) ... 30, 31

8 U.S.C. § 1152(a)(1)(B) ... 31, 41

8 U.S.C. § 1151(b)(2) ... 28

8 U.S.C. § 1157(a) ... 37

8 U.S.C. § 1157(a)(1)-(3) ... 36

8 U.S.C. § 1157(a)(2) ... 58

8 U.S.C. § 1157(e) ... 36

8 U.S.C. § 1182(a) ... 34

8 U.S.C. § 1182(a)(1) ... 37

8 U.S.C. § 1182(a)(3)(A)-(B) ... 37

8 U.S.C. § 1182(a)(3)(B) ... 32, 34

8 U.S.C. § 1182(a)(3)(B)(ii)(I) ... 28

8 U.S.C. § 1182(f) ... *passim*

**Page(s)**

8 U.S.C. § 1185(a)(1) .......... 27, 30

8 U.S.C. § 1187(a)(12) .......... 35, 37, 41

8 U.S.C. § 1187(a)(12)(A) .......... 35

8 U.S.C. § 1187(a)(12)(D) .......... 36

Pub. L. No. 100-204, § 901(a), (b)(2), 101 Stat. 1399-1400 .......... 32

Pub. L. No. 101-649, § 601(a), 104 Stat. 5067 .......... 33

USA PATRIOT Act of 2001, Pub. L. No. 107-56 .......... 33

Haw. Rev. Stat. § 378-2(1) .......... 21

Haw. Rev. Stat. § 489-3 .......... 21

Haw. Rev. Stat. § 515-3 .......... 21

**REGULATIONS:**

81 Fed. Reg. 70315 (Oct. 11, 2016) .......... 36

82 Fed. Reg. 8977 (Jan. 27, 2017) .......... 4

82 Fed. Reg. 13,209 (Mar. 6, 2017) .......... 6

**LEGISLATIVE MATERIAL:**

H.R. Conf. Rep. No. 100-475 (1987) .......... 32

H.R. Rep. No. 100-882 (1988) .......... 33

**OTHER AUTHORITIES:**

9 FAM § 302.14-3(B)(1)(b)(3) (Dec. 20, 2016) .......... 40

161 Cong. Rec. E1791 (Dec. 8, 2015) (statement of Rep. Van Hollen) .......... 35

161 Cong. Rec. H9035 (Dec. 8, 2015) (statement of Rep. Moulton) .......... 36

**Page(s)**

161 Cong. Rec. H9050 (Dec. 8, 2015) (statement of Rep. Lofgren) ............... 35, 36

161 Cong. Rec. H9055 (Dec. 8, 2015) (statement of Rep. Jackson Lee) ............... 36

161 Cong. Rec. H9056 (statement of Rep. Hoyer) ............... 36

Cong. Research Serv., *Executive Authority To Exclude Aliens: In Brief* (Jan. 23, 2017) ............... 40

James Madison, Memorial and Remonstrance against Religious Assessments (June 20, 1785) ............... 24

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ............... 23, 44, 47

Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015) ............... 8

Sopan Deb, *Trump continues to question Obama's commitment to fighting terror*, CBS NEWS (June 14, 2016) ............... 3

The White House, Office of the Press Sec'y, *Press Briefing by Press Secretary Sean Spicer #18* (Mar. 7, 2017) ............... 8

*Transcript of President Donald Trump's speech to the Major Cities Chiefs Police Organization*, THE HILL (Feb. 8, 2017) ............... 5

*UH a popular destination for international students*, UH NEWS (Apr. 20, 2017) ............... 18

*Visitor Arrivals from Middle East & Africa*, HAWAII TOURISM AUTHORITY ............... 20

## INTRODUCTION

Ten weeks ago, this Court affirmed an injunction of the President's unlawful and unconstitutional Executive Order. In no uncertain terms, it denounced the Government's contention that the Executive possesses "unreviewable" power over immigration, and that judicial scrutiny "in itself imposes substantial harm." It rebuffed the President's assertion that the immigration laws gave him the "absolute right" to impose his long-promised "Muslim ban" by shutting the Nation's doors to immigrants from seven overwhelmingly Muslim countries and by barring refugees altogether. It condemned the President's attempt to ignore the core guarantees of the Bill of Rights. And it vindicated the vital role the judiciary plays in safeguarding individual liberty.

The President was not listening. A month later, he reissued the Order with the same title and virtually the same travel and refugee bans. Again the President and his advisors did little to disguise the Order's true nature. President Trump proudly admitted that the new Order was just "a watered down version of the first," while his advisor explained that it sought to achieve the "same basic policy outcome." And again, in this Court, the President claims a nearly limitless power to make immigration policy that is all but immune from judicial review. Again, he must be checked.

This President is not the first leader to claim such unfettered authority. More than two centuries ago, our Framers recognized the same evil in the monarchy they fled: The "accumulation of all powers, legislative, executive, and judiciary, in the same hands * * * may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). The Framers drafted a Constitution to protect us from that evil, separating the powers into three branches and setting out our fundamental liberties in the Bill of Rights.

The Executive Order flouts those protections. While the Constitution commits the immigration power to Congress, the President claims it for his own, recognizing no statutory limits on his powers of exclusion. And while the Bill of Rights guarantees Due Process and forbids the establishment of religion, the President seeks to enact a thinly veiled Muslim ban, shorn of procedural protections and premised on the belief that those who practice Islam are a danger to our country.

The Constitution is not so easily cast aside. It confers upon the Judicial Branch the task of safeguarding the rights of the people from the encroachment of the other branches. This Court has fulfilled that role once before. It must do so again. The preliminary injunction should be upheld.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The First Executive Order

In December 2015, then-candidate Donald Trump made the exclusion of Muslims a core plank of his campaign platform. He issued a public statement calling for "a total and complete shutdown of Muslims entering the United States." E.R. 144 & S.E.R. 156. In a March 2016 interview, he explained his rationale: "I think Islam hates us * * *. [W]e can't allow people coming into this country who have this hatred of the United States * * * [a]nd of people that are not Muslim." TRO Opinion ("TRO") at 3 (Dist. Ct. Dkt. 219); E.R. 57, 145. He expressed particular concern regarding Muslim refugees. In June 2016, Mr. Trump said that his opponent would "admit[] hundreds of thousands of refugees from the Middle East" who would "try[] to take over our children and convince them * * * how wonderful Islam is." E.R. 146 (linking to https://goo.gl/kgHKrb).

Mr. Trump also explained how he would implement his proposal, asserting that "the immigration laws" grant "the President" the power "to suspend entry" of "any class of persons." *Id.* Later the same day, he elaborated, "the president has the right to ban any group or anybody that he feels is going to do harm to the country. They have an absolute right."[1]

[1] Sopan Deb, *Trump continues to question Obama's commitment to fighting terror*, CBS NEWS (June 14, 2016), https://goo.gl/TzQ5aj.

As the campaign progressed, Mr. Trump sometimes began to couch the Muslim ban in different terms, as a ban on immigration from countries "where there's a proven history of terrorism." E.R. 145. But when asked in July 2016 whether this approach represented a "rollback" of his earlier-announced Muslim ban, he disagreed: "In fact, you could say it's an expansion." E.R. 146. Later, during a presidential debate, Mr. Trump explained: "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world." E.R. 147. When asked on December 21, 2016, now as President-Elect, whether he had decided to "rethink" his "plans to create a Muslim registry or ban Muslim immigration," his answer was: "You know my plans." E.R. 147.

Within his first week in office, President Trump signed Executive Order No. 13,769, entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States." 82 Fed. Reg. 8977 (Jan. 27, 2017). As he signed, he read the title, looked up, and said: "We all know what that means." E.R. 148.

The first Order imposed an immediate, 90-day ban on entry by nationals of seven "overwhelmingly Muslim" countries. TRO at 31. The Order also suspended the U.S. Refugee Admissions Program for 120 days, lowered the cap on refugee admissions, and indefinitely barred Syrian refugees, subject to a targeted carve-out for refugees who were "religious minorit[ies]" in their home countries. E.R. 150.

In an interview with the Christian Broadcasting Network the day the Order was signed, President Trump explained that the Order was designed to create a "priority" for Christian refugees, falsely asserting that Syrian Christians had previously been kept out of the United States, while Muslims "could come in." E.R. 150. In a television interview the next day, Presidential Advisor Rudolph Giuliani explained further: "When [Donald Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" E.R. 150-151. President Trump later explained that the legal basis for the Order was "8 U.S.C. 1182(f)," a provision he said meant "you can suspend, you can put restrictions, you can do whatever you want."[2]

The first Order spurred confusion, chaos, and outrage. Over 100 individuals were immediately detained at U.S. airports, and the Government revoked 60,000 visas during the first week. E.R. 152-154. Within hours, individuals and entities began filing lawsuits challenging the Order, and within a week a Washington District Court enjoined its enforcement nationwide. *Washington* v. *Trump*, 2017 WL 2462040 (W.D. Wash. Feb. 3, 2017).

The Government filed an emergency appeal. E.R. 155. In this Court, it argued that the ban was "unreviewable," and that "[j]udicial second-guessing of

[2] *Transcript of President Donald Trump's speech to the Major Cities Chiefs Police Organization*, THE HILL (Feb. 8, 2017), https://goo.gl/BkvQM2.

the President's national security determination in itself imposes substantial harm." Emergency Stay Mot. at 2, 21, *Washington* v. *Trump*, No. 17-35105 (9th Cir.). On February 9, 2017, this Court affirmed the nationwide injunction in a published, unanimous opinion. *Washington* v. *Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

**B. The Second Executive Order**

The Government did not appeal this Court's decision; instead, it decided to issue a "revised" Order. E.R. 155. In the words of President Trump's Senior Advisor, Stephen Miller—appearing in a television interview on February 21, 2017—the revised Order would "have the same basic policy outcome" as the first, and any changes would address "very technical issues that were brought up by the court." E.R. 156. The White House planned to release the revised Order on March 1, 2017, but delayed the announcement to avoid "undercut[ting] the favorable coverage" of President Trump's speech to Congress. *Id.* at 157.

As the new Order was being prepared, the Department of Homeland Security issued memoranda severely undermining its purported national security rationale. Notably, on February 24, 2017, a draft DHS report concluded that nationality was an "unlikely indicator" of terrorism threats against the United States. E.R. 151, S.E.R. 158-160.

Undeterred, President Trump issued a revised Order on March 6, 2017. Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017). Consistent with Mr.

Miller's statement, its substance is largely unchanged from the first. Section 2(c) now bans nationals of six (rather than seven) overwhelmingly Muslim countries from "entry into the United States" or being "issu[ed] a visa" for a period of 90 days. Order §§ 2(c), 3(c); *see id.* § 1(g) (stating that the Order omits Iraq because of its "close cooperative relationship" with the United States); *see also* TRO at 31. This Order exempts individuals who are present in the United States or who have been granted lawful status; otherwise, aliens may escape the bar only by obtaining a wholly discretionary, "[c]ase-by-case waiver." Order § 3(a)-(c). The Order also instructs the Secretary of Homeland Security to conduct a "worldwide review" to determine whether the President's ban should be extended to "additional countries." *Id.* § 2(a)-(b), (d)-(g).

The Order retains the President's refugee ban, as well. Section 6(a) suspends all "travel of refugees into the United States" as well as all "decisions on applications for refugee status" for a period of 120 days. Section 6(b) lowers the cap on refugees that may be admitted to the United States this year, from 110,000 to 50,000. Although the Order no longer contains an explicit preference for Christian refugees, it permits Administration officials to exempt aliens "on a case-by-case basis, in their discretion." *Id.* § 6(c). This waiver provision, like the exception to the travel ban, does not "create any right or benefit, substantive or procedural, enforceable at law or in equity." *Id.* § 16(c).

Within a week of the Order's issuance—and after the District Court enjoined the new Order nationwide—the President told a rally of his supporters that this new Order was just "a watered down version of the first one" that had been "tailor[ed]" at the behest of "the lawyers." S.E.R. 84. He added: "I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first place." *Id.* That night, President Trump reiterated his view that it is "very hard" for Muslims to assimilate into Western culture. S.E.R. 95.

To this day, the President's campaign statement "calling for a total and complete shutdown of Muslims entering the United States" remains on his regularly updated campaign website. *See* E.R. 144 & S.E.R. 156.[3] In a briefing the day after the revised Order was signed, White House Press Secretary Sean Spicer told reporters that with the Order, President Trump "continue[d] to deliver on * * * his most significant campaign promises."[4]

### C. Procedural History

The State of Hawaii filed its complaint and motion for a TRO as to the first Order on February 3, 2017. After the Washington court entered its nationwide injunction, Judge Watson stayed proceedings in this case, lifting the stay

---

[3] Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), https://goo.gl/D3OdJJ.
[4] The White House, Office of the Press Sec'y, *Press Briefing by Press Secretary Sean Spicer #18* (Mar. 7, 2017), https://goo.gl/dYyRzY.

temporarily to allow the State to file an amended complaint adding Dr. Ismail Elshikh—the Imam of the Muslim Association of Hawaii—as a plaintiff.

When the revised Order was issued, the court lifted the stay. On March 8, Plaintiffs filed a Second Amended Complaint and a new motion for a TRO. Dkt. 64-65. In their filings, Plaintiffs argued that Sections 2 and 6 of the revised Order exceeded the President's authority under the Immigration and Nationality Act ("INA"), violated the Establishment Clause, and deprived individuals of Due Process. Dkt. 64-1. They sought a nationwide injunction of both provisions. *Id.*

Following a hearing on March 15, 2017, the District Court granted the requested relief. Dkt. 219. In a 43-page opinion, the court found that both Plaintiffs had standing, *id.* at 15-25, that their claims were ripe, *id.* at 25-27, and that "[a]ny reasonable, objective observer would conclude * * * that the stated secular purpose of the Executive Order is, at the very least, 'secondary to a religious objective' of temporarily suspending the entry of Muslims," *id.* at 36; *see id.* at 29-40. Because the Establishment Clause violation was clear, the court "express[ed] no view on Plaintiffs' due-process or INA-based statutory claims." *Id.* at 29 n.11. Finding the other factors met, the court temporarily enjoined the Government from "enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation." *Id.* at 42.

After a second hearing, the court granted Plaintiffs' motion to convert the TRO into a preliminary injunction. Dkt. 238; 270. The court reaffirmed Plaintiffs' standing and the Establishment Clause violation, again reserving the statutory and Due Process questions. Dkt. 270 at 8-19. The court declined to narrow the scope of the injunction, explaining that "the *entirety* of the Executive Order runs afoul of the Establishment Clause" and, in any event, the Government had "fail[ed] to provide a workable framework for narrowing the scope of the enjoined conduct." *Id.* at 20-22 (emphasis added).

The Government appealed.

## SUMMARY OF ARGUMENT

The District Court correctly held that the Executive Order violates the Establishment Clause. The Order also exceeds the President's statutory authority and contravenes the constitutional guarantee of Due Process. Unable to provide a compelling defense on the merits, the Government tries at every turn to evade judicial review. Those arguments fail. This Court can and should affirm the simple truth that the Order is unlawful several times over.

I. Both Dr. Elshikh and Hawaii have standing. The Order, and the animus it embodies, inflict a dignitary harm on Dr. Elshikh by suggesting his faith is synonymous with terrorism, and by rendering him, his family, and the members of his mosque second-class citizens. Furthermore, the Order erects a high hurdle to

the admission of his children's Syrian grandmother, and chills his ability to publicly practice and raise his children in his faith.

Hawaii, too, suffers a host of harms. The Order effects an establishment of religion in the State, in violation of the Establishment Clause's core protection of federalism. Further, Hawaii's University, its tourism industry, and its right to enforce its sovereign prerogatives are all hurt by the discriminatory Order. Any one of these harms would be sufficient to confer standing, particularly given the "special solicitude" owed States in the standing analysis. *Massachusetts* v. *EPA*, 549 U.S. 497, 520 (2007).

II.A. Not only does the Court have jurisdiction to hear this case, but it must do so to vindicate fundamental separation-of-powers and liberty principles. The President claims an unreviewable authority to make immigration policy. The Constitution, however, entrusts the immigration power to Congress, and courts have a vital role in ensuring that any presidential exercise of delegated power comports with the will of Congress and the Constitution. The President's Order does neither.

B. The Court need not even reach the clear constitutional violations in this case because the Order grossly exceeds the President's *statutory* authority. The President claims that 8 U.S.C. § 1182(f) grants him limitless authority to suspend immigration. But Congress has enacted express limits on nationality-based

exclusions, established a careful and reticulated scheme for excluding terrorists, and examined the specific evidence on which this Order is based and judged a broad-based ban unnecessary. The Order overthrows *all* of those judgments; indeed, its dragnet bans lack precedent in either modern immigration law or Executive practice. It would be uncharacteristic, if not unconstitutional, for Congress to delegate the President sweeping legislative power to ignore its laws in all these respects. It did not, and this Court should enforce the reasonable limits that make this Order unlawful.

C. If the Court reaches the constitutional question, it is easily answered. Defendants seek to avoid scrutiny by pointing to the plenary immigration power vested in *Congress*. But that doctrine does not apply to *Executive* policymaking; rather, there is an increased need for judicial review when the Executive exercises a borrowed legislative power.

Under any standard, the Order's barely disguised Muslim ban violates the Establishment Clause. The Order casts opprobrium on the Muslim faith and imposes disproportionate burdens on Muslim-Americans. Its text, operation, history, and context all confirm that the Order is the embodiment of a policy of religious animus. The Government's only real response is to ask the Court to close its eyes to abundant evidence of discrimination. But no precedent supports that request, nor will affirming the injunction inappropriately inhibit future Executive

action. It will only prevent the President from making policy premised on the explicit assertion that faith is a proxy for dangerousness.

D. Finally, the Order exhibits the same Due Process defects that led this Court to enjoin the first Order. The Order still offers *no* enforceable procedural rights to aliens, even where their admission is essential to the liberty interests of an American citizen or institution. And it denies refugees the process Congress afforded them.

III. These glaring statutory and constitutional flaws are more than enough to affirm the full scope of the District Court's injunction. The constitutional guarantees of separated powers and enumerated rights demand nothing less.

## ARGUMENT

### I. The Court Has Jurisdiction To Review The Executive Order.

Defendants argue that neither Dr. Elshikh nor Hawaii has standing. Defendants have set themselves a difficult task: To show standing at this "preliminary stage of the litigation," *Washington*, 847 F.3d at 1159, Plaintiffs need demonstrate only that the allegations in their Complaint and the other evidence they have submitted establish the "minimal" injury Article III requires, *Preminger* v. *Peake*, 552 F.3d 757, 763 (9th Cir. 2008). Plaintiffs have satisfied their burden many times over, with respect to both Dr. Elshikh and Hawaii. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc.* v. *Brown*, 567 F.3d 521, 523 (9th Cir.

2009) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.").

**A. Dr. Elshikh Has Standing.**

The Order inflicts two distinct and immediate injuries on Dr. Elshikh: It conveys a government message of disapproval toward his religion, and it imposes special barriers preventing him from reuniting with his mother-in-law. Both harms are easily sufficient to confer standing.

1. An individual may demonstrate standing to raise an Establishment Clause claim by pointing to dignitary harms that flow directly from government condemnation of his religion. *Vasquez* v. *L.A. Cty.*, 487 F.3d 1246, 1251 (9th Cir. 2007) ("direct contact with [a] purportedly offensive anti-religious symbol" is a "sufficiently concrete injury" for standing). As Justice Scalia wrote, "[t]he indignity of being singled out for special burdens on the basis of one's religious calling is so profound that the concrete harm produced can never be dismissed as insubstantial." *Locke* v. *Davey*, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting). This Court, sitting *en banc*, has thus held that Catholic residents of San Francisco had standing to challenge a municipal ordinance that "convey[ed] a government message of disapproval and hostility toward their religious beliefs." *Catholic League for Religious & Civil Rights* v. *City & Cty. of S.F.*, 624 F.3d 1043, 1048 (9th Cir. 2010).

Under these principles, Dr. Elshikh plainly has standing to challenge both Sections 2 and 6 of the Order. He has suffered clear dignitary harm from the travel ban and the refugee bar, which convey a message of anti-Muslim animus that has "devastat[ed]" him and caused his children to believe that their country "discriminate[s] against individuals * * * who hold the same religious beliefs." E.R. 94, 96 (Elshikh Decl. ¶¶ 3, 6); *see* E.R. 161-162; Br. Amicus Curiae of Dr. Ismail Elshikh ("Elshikh Amicus") at 4-6, 10-12, *Int'l Refugee Assistance Project, et al.* v. *Trump, et al.*, No. 17-1351 (4th Cir. Apr. 19, 2017), ECF No. 146. That harm is "direct." *Vasquez*, 487 F.3d at 1251. Like the plaintiffs in *Catholic League*, Dr. Elshikh is a member of "the political community" whose government promulgated this "message of disapproval and hostility." 624 F.3d at 1048, 1052. He is also Imam of a mosque whose members the Order denigrates, and whose worship it burdens through forced exclusion of new members, including refugees. Elshikh Amicus at 11. And he and his family are particularly harmed by the Order because it imposes an impediment to the admission of Dr. Elshikh's Syrian mother-in-law, causing his children to ask: "Dad, how come we can't have our grandmother like our friends; is it because we are Muslims?" E.R. 94 (Elshikh Decl. ¶ 3).

The Government claims (Br. 26-27) that standing is foreclosed by *Valley Forge Christian College* v. *Americans United for Separation of Church & State,*

*Inc.*, 454 U.S. 464 (1982). That is incorrect. *Valley Forge* held that "[a] 'psychological consequence' does not suffice as concrete harm where it is produced merely by 'observation of conduct *with which one disagrees*.' " *Catholic League*, 624 F.3d at 1052 (emphasis added) (quoting *Valley Forge*, 454 U.S. at 485-486). As the *en banc* Court has made clear, however, a psychological injury "*does* constitute concrete harm where," as here, "[it] is produced by government condemnation of one's own religion." *Id.* (emphasis added).

2. Dr. Elshikh also has standing to challenge the Order by virtue of the obstacles it creates to reunification with his mother-in-law. *See Kerry* v. *Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring). Dr. Elshikh's mother-in-law is a Syrian national seeking an immigrant visa. E.R. 94-95 (Elshikh Decl. ¶ 4). Because the Order blocks her entry into the United States, it prevents Dr. Elshikh and his family from "see[ing], spend[ing] time with, and get[ting] to know her." *Id.* ¶ 6. The mere possibility that she might be granted a discretionary waiver does not, as the Government claims (Br. 29), make this injury unripe. The "denial of equal treatment resulting from the imposition of [a] barrier" is *itself* an injury, regardless of whether it results in the "ultimate inability to obtain [a] benefit." *Gratz* v. *Bollinger*, 539 U.S. 244, 262 (2003); *see also Clinton* v. *City of N.Y.*, 524 U.S. 417, 433 (1998). Indeed, during the oral argument in *Washington*, the Government told this Court that "a U.S. citizen with a connection to someone

seeking entry" would have "a route to make a constitutional challenge." Oral Arg. 24:28-24:47, *Washington,* No. 17-35105 (9th Cir. Feb. 7, 2017), ECF No. 124.

**B. Hawaii Has Standing.**

Hawaii has standing to challenge Sections 2 and 6 of the Order, particularly given the "special solicitude" States receive "in the standing analysis." *Massachusetts,* 549 U.S. at 520. The Order effects an establishment of religion in the State; prevents students and faculty from joining its University; harms the State's tourism industry and tax revenues; and impairs Hawaii's sovereign interests in carrying out its laws and policies.

1. Hawaii plainly has standing to challenge Sections 2 and 6 under the Establishment Clause. A core function of that Clause is the "protect[ion] [of] States, and by extension their citizens, from the imposition of an established religion by the Federal Government." *Zelman* v. *Simmons-Harris,* 536 U.S. 639, 677 (2002) (Thomas, J., concurring). Hawaii has alleged that the Order carries out an unconstitutional establishment of religion. E.R. 164, 167. The Clause's protections would be empty if the State could not sue to redress that injury. *Cf. Washington*, 847 F.3d at 1160 n.4.

2. Hawaii also has standing because of the injuries inflicted on its University. In *Washington,* this Court found that Washington and Minnesota had standing to press their claims based on "two logical steps: (1) the Executive Order

prevents nationals of seven countries from entering [the States]; (2) as a result, some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave." 847 F.3d at 1161.

Hawaii has made the same showing here. Its University has 23 graduate students, multiple faculty members, and 29 visiting faculty from the designated countries. E.R. 120-121 (Supp. Dickson Decl. ¶ 7). The University recruits from the affected countries, and people in those countries apply to the University. Just yesterday, the University announced that eleven graduate students from those countries have been admitted for the 2017-2018 academic year, and the University is still considering applications from twenty-one additional affected graduate students.[5] The Order would bar those people from traveling to the United States. Accordingly, Hawaii will be harmed because "some of the[] people" banned by the Order "will not enter state universities" and "will not join those universities as faculty." *Washington*, 847 F.3d at 1161.

The Government argues (Br. 23) that because the Order only "suspends entry for a 90-day period," any harm to the University is "speculative." But the "University's ability to recruit and enroll students and graduate students" and its

[5] *UH a popular destination for international students*, UH NEWS (Apr. 20, 2017), https://goo.gl/1HiawX.

ability to "recruit and hire visiting faculty" are *already* being "constrained" by the Order. E.R. 121 (Supp. Dickson Decl. ¶ 7). The Court need look no further than the eleven admitted graduate students whose enrollment decisions are being affected *right now.* It is common sense that an individual with any choice in the matter will reject a position in a country she may not be permitted to enter.

The Government also claims (Br. 23) that the University's injuries are unripe "until a prospective student or faculty member requests a waiver and is denied." The Government made precisely the same argument in *Washington*, Emergency Stay Mot. at 2, No. 17-35105 (9th Cir.), and it did not persuade the Court then, *see Washington*, 847 F.3d at 1169. The chill the Order inflicts does not depend on the denial of a waiver to a particular individual. *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014) (standing predicated on chill to unidentified purchasers). And the waiver provisions do nothing to ameliorate the harm inflicted by the increased burden on entry for these foreign students. *See supra* 16.

3. Furthermore, Hawaii has standing by virtue of the harm the Order inflicts on its tourism industry. A government entity has a "proprietary interest in revenues earned from * * * tax," *Colo. River Indian Tribes* v. *Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985), and in preserving the beneficial effects of its "tourism industry," *City of Sausalito* v. *O'Neill*, 386 F.3d 1186, 1198-99 (9th Cir.

2004). Hawaii has established that the Order chills tourism, thereby decreasing the State's tax revenues.

As the District Court found, "preliminary data from the Hawaii Tourism Authority" that "includ[es] visitors from Iran, Iraq, Syria, and Yemen" suggests that "during the interval of time that the first Executive Order was in place, the number of visitors to Hawaii from the Middle East dropped." TRO at 20; *see* E.R. 164. More recent numbers on the Hawaii Tourism Authority's website confirm this trend: Visits from the Middle East in February 2017 were down over *60%* compared to one year ago.[6] That is more than sufficient to establish standing because "even a small amount of money is ordinarily an 'injury,' " especially in the "Establishment Clause" context. *Czyzewski* v. *Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

The Government objects (Br. 22) that the State has not "identifie[d]" a specific "individual who has 'concrete plans' to come to the University" or to travel to Hawaii as a tourist. Again, the Government ignores the chill that has already occurred, including from the provisions that establish a process for expanding the travel ban. *See* Order § 2(a)-(f); *Lexmark*, 134 S. Ct. at 1394; *Texas* v. *U.S.*, 809 F.3d 134,155 (2015) (State had standing to challenge costs imposed by

[6] *Visitor Arrivals from Middle East & Africa*, HAWAII TOURISM AUTHORITY, http://goo.gl/tM6krh.

immigration order without pointing to specific individuals that will impose those costs).

4. Finally, Hawaii has standing because the Order impairs its sovereign interests in enforcing its antidiscrimination laws and carrying out its refugee policies. Hawaii's laws protect religious freedom and equal rights, bar discrimination, and foster diversity. *See* Haw. Const. art. 1, §§ 2, 4; Haw. Rev. Stat. §§ 378-2(1), 489-3, 515-3, E.R. 163. Hawaii also has several state policies to aid and resettle refugees. E.R. 166. The Order commands Hawaii to abandon these sovereign prerogatives by requiring the State to exclude individuals based on their nationality, religion, and refugee status. Any time a State is prevented from "effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

### C. The Government's Remaining Arguments Against Jurisdiction Are Meritless.

The Government offers two additional arguments in its attempt to foreclose this Court's consideration of the merits. Both fail.

*First*, the Government contends (Br. 30) that Plaintiffs lack "prudential standing" to raise an Establishment Clause claim "on behalf of * * * third party aliens." This argument rests on a false premise. Dr. Elshikh is asserting that the Order causes *him* dignitary harm and burdens *his* ability to be reunited with his

mother-in-law. Hawaii, likewise, is asserting that the Order impairs *its* rights to be free from a federal establishment of religion, enroll students and faculty in its University, earn tax revenues, and enforce its sovereign prerogatives. Anyway, *Washington* made clear that States have standing to sue on behalf of their students and faculty. 847 F.3d at 1160 n.4.

*Second*, the Government contends this lawsuit is barred by the "doctrine of consular nonreviewability" because it involves the "decision to issue or withhold a visa." Br. 32 (quotation omitted). That contention is staggering in its breadth; it would disable judicial review of even the most overt constitutional violation in the immigration context. "There is no precedent to support this claimed unreviewability, which runs contrary to the fundamental structure of our constitutional democracy." *Washington*, 847 F.3d at 1161. The consular nonreviewability doctrine restricts review of *individual* consular decisions, *see Li Hing of Hong Kong, Inc.* v. *Levin*, 800 F.2d 970, 971 (9th Cir. 1986), but it does not prevent a challenge to "the President's *promulgation* of sweeping immigration policy," *Washington*, 847 F.3d at 1162. "[C]ourts can and do review" such claims. *Id.* at 1163.

## II. The Order Is Unlawful.

### A. The Constitution Entrusts the Immigration Power to Congress in Order to Protect Liberty.

On the merits, the Government begins with the assertion that the President wields "inherent" and wide-ranging "power over immigration matters," Br. 34, and ends with the claim that courts may not "second-guess" the reasons he uses that power—no matter how often, or how clearly, he says that his purpose is one the Constitution abhors, *id.* at 46. That argument falters at every step.

Under the Constitution, the power to make immigration laws is "entrusted exclusively to Congress." *Arizona* v. *United States*, 132 S. Ct. 2492, 2507 (2012) (quoting *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)); *see* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power * * * To establish an uniform Rule of Naturalization"). The Framers made this choice deliberately. As immigrants and descendants of immigrants, they were well aware that the power to welcome or exclude carries with it authority to shape every facet of the Nation. And they knew—from hard experience—that immigration can be a potent tool of religious persecution. Virginia colonists had established the Anglican Church in part by "ma[king] the oath of [that religion's] supremacy a precondition to immigration." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2116-17 (2003). Likely with this in mind, James Madison explained that "the first step * * * in the

career of intolerance" is to place "a Beacon on our Coast, warning" the "persecuted and oppressed of every Nation and Religion" that they must "seek some other haven." *Engel* v. *Vitale*, 370 U.S. 421, 432 n.16 (1962) (quoting James Madison, Memorial and Remonstrance against Religious Assessments (June 20, 1785)).

Accordingly, the Founders "consciously" chose to place immigration policy in the hands of a "deliberate and deliberative" body. *INS* v. *Chadha*, 462 U.S. 919, 959 (1983); *see Fiallo* v. *Bell*, 430 U.S. 787, 796 (1977) (the Constitution assigns immigration matters "solely for the responsibility of the Congress"). Having "lived under a form of government that permitted arbitrary governmental acts to go unchecked," they did not wish this vital and dangerous authority to be at the mercy of the "arbitrary action of one person." *Chadha*, 462 U.S. at 951, 959. As with many of the Constitution's structural safeguards, they vested immigration authority in Congress "to safeguard individual liberty." *NLRB* v. *Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (quoting *Clinton*, 524 U.S. at 449-450 (Kennedy, J., concurring)).

The President therefore cannot exercise the immigration power at will. He possesses only that authority Congress has delegated to him with "adequate standards." *Carlson* v. *Landon*, 342 U.S. 524, 542-544 (1952). In some circumstances—when he "faithfully execute[s]" the law by "exclud[ing] a given alien," or when he acts as "Commander in Chief" to regulate entrance "during a

time of national emergency”—that authority is bound up with an inherent Executive power and the President’s power is at its apex. *U.S. ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 543 (1950), U.S. Const. art. II §§ 2-3; *see Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 635-636 (1952) (Jackson, J., concurring). But no such circumstance is present here. The President is not excluding “a given alien,” but millions of them, almost all Muslim. Nor does he claim an exigency: By his own admission, the President is responding to a decades-old threat that Congress has specifically enacted legislation to address. *See* Order § 1(e), (h); *infra* 34-37.

Instead, the President purports to invoke a limitless authority that he believes Congress conferred upon him: the power to “suspend” contained in 8 U.S.C. § 1182(f). He says that he may exclude any aliens, for any reason whatsoever, regardless of what any other statute or the Constitution says. And he makes good on these assertions, using that power to override statutes, effectuate religious persecution, and deny millions of aliens the process Congress afforded them. This is the very evil the Framers sought to avoid.

Some encroachments on liberty and the separation of powers embodied in the Constitution are difficult to recognize. No guesswork is needed to discern the violation in this case: “[T]his wolf comes as a wolf,” *Morrison* v. *Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting), even if it has thrown on an article or two of

sheep's clothing. To preserve the Constitution's safeguards of freedom, the injunction must be upheld.

### B. The Order Exceeds the President's Delegated Authority.

As the District Court correctly held, the Order violates the Establishment Clause. But that is far from the only ground on which the injunction may be affirmed. Notably, the President claims the immigration statutes give him the boundless authority to enact his discriminatory order. They do nothing of the kind; indeed, they would bar this Order even if it were not unlawfully motivated by religious animus. Because it is black-letter law that courts should consider statutory claims first, we begin with the President's violation of the immigration laws.

#### *1. The President lacks the limitless suspension power he claims.*

The President has no statutory authority to issue this Order. Defendants rely on 8 U.S.C. § 1182(f). That provision, originally enacted in 1952, states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

The Government, like the President himself, contends that this statute vests the President with "an absolute right" to bar entry by any group of aliens he wants. *Supra* 4 n.1; *see* Br. 7, 20. On its view, the President can use that power to ignore

other immigration statutes. *See* TRO Opp'n at 26, Dkt. 145. And it asserts that the President can freely establish "exceptions" to his immigration restrictions pursuant to 8 U.S.C. § 1185(a)(1). *See* Order § 3. Because Presidents have never recognized temporal limits on the 1182(f) power, *see*, *e.g.*, Proclamation No. 4865 (Sept. 29, 1981) (suspension on entry still in effect); Proclamation No. 6749 (Oct. 25, 1994) (same), this amounts to a claim that the INA permits the President, at his whim, to wipe away with one hand the entry rules Congress enacted, and erect with the other a system of the President's own design.

This cannot be. Such a wholesale "[a]bdication" of Congress's immigration authority would threaten "the political liberty * * * the separation of powers seeks to secure." *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring). Congress cannot delegate its immigration power to the President absent meaningful constraint. *Whitman* v. *Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001); *see, e.g.*, *INS* v. *Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 192-93 (1991); *Zemel* v. *Rusk*, 381 U.S. 1, 17-18 (1965); *Carlson*, 342 U.S. at 542. And it certainly cannot give away a power as vast and consequential as plenary control over the Nation's borders. *Whitman*, 531 U.S. at 475 ("[T]he degree of * * * discretion that is acceptable varies according to the scope of the power congressionally conferred.").

At the very least, a statement of the utmost clarity would be required before inferring that Congress attempted to make such a constitutionally dubious transfer

of authority. *See UARG* v. *EPA*, 134 S. Ct. 2427, 2442 (2014); *AFL-CIO* v. *Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980). Section 1182(f) contains no such statement. At least three limitations therefore apply:

*First*, the President may not contradict the provision's text, which permits him to exclude aliens only if their entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). If Congress has considered the evidence and determined that a class of aliens is *not* "detrimental to the interests of the United States," the President cannot look at that same evidence and invoke 1182(f) to exclude them. For example, he may not—absent exigent circumstances—exclude those Congress has favored for admission, *see, e.g.*, 8 U.S.C. § 1151(b)(2) (immediate relatives), or has purposefully protected from an inadmissibility determination, *see, e.g., id.* § 1182(a)(3)(B)(ii)(I) (innocent spouses and children). Deeming such aliens detrimental to American interests in the teeth of Congress's contrary judgment would make nonsense of the statute.

*Second*, the President cannot use section 1182(f) to override more specific provisions of the immigration laws. *See Law* v. *Siegel*, 134 S. Ct. 1188, 1194 (2014). Thus, if Congress has expressly provided that the Executive may not exclude aliens on a particular ground, the President cannot use 1182(f) to do the opposite. *See UARG*, 134 S. Ct. at 2446. Nor may the President "evade" the limitations imposed on specific and carefully crafted statutory grounds for

inadmissibility by appealing to his general section 1182(f) power. *EC Term of Years Tr*. v. *United States*, 550 U.S. 429, 434 (2007); *see Abourezk* v. *Reagan*, 785 F.2d 1043, 1057 (D.C. Cir. 1986) (Ginsburg, J.); *Allende* v. *Shultz*, 845 F.2d 1111, 1118 (1st Cir. 1988) (Bownes & Breyer, JJ.). Permitting the President to ignore "unambiguous requirements imposed by a federal statute" in either of these ways would "deal a severe blow to the Constitution's separation of powers." *UARG*, 134 S. Ct. at 2446.

*Third*, the President must exercise his discretion under section 1182(f) in a manner consistent with the INA's policies and purposes. *See, e.g.*, *Reno* v. *Flores*, 507 U.S. 292, 309 (1993); *Nat'l Ctr. for Immigrants' Rights*, 502 U.S. at 192-93 (1991); *Carlson*, 342 U.S. at 537. The Supreme Court has long held, for instance, that the Executive must base admission and deportation decisions on an alien's "fitness to reside in this country," not on "fortuitous and capricious" circumstances that make an alien's right to enter the country a "sport of chance." *Judulang* v. *Holder*; 565 U.S. 42, 53, 59 (2011) (quoting *Delgadillo* v. *Carmichael*, 332 U.S. 388, 391 (1947), *Rosenberg* v. *Fleuti*, 374 U.S. 449, 455 (1963)). The Court has applied a similar principle to other supposedly unbounded delegations of

legislative authority in the immigration context. *See, e.g.*, *Carlson*, 342 U.S. at 537; *United States* v. *Witkovich*, 353 U.S. 194, 199-202 (1957).[7]

These principles are all basic safeguards of the separation of powers and, ultimately, liberty. The Order transgresses them all.

*2. The Order violates section 1152(a)(1)(A).*

The Order's first statutory overreach could not be clearer. In 1965, Congress enacted section 1152(a)(1)(A), a landmark civil rights law mandating that "[e]xcept as specifically provided" in certain subsections, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). As Judge Sentelle has explained, "Congress could hardly have chosen more explicit language": It "unambiguously directed that no nationality-based discrimination shall occur." *LAVAS* v. *Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). Yet that is exactly what section 2(c) does: It prohibits "nationals" of six specified countries from being "issu[ed] a visa"—including an immigrant visa—or "enter[ing]" the country. Order §§ 2(c), 3(c).

---

[7] It is unclear whether the Government invokes section 1185(a)(1) as an independent basis for the travel and refugee bans. But to the extent it does, that provision is subject to at least the same limits. *See* 8 U.S.C. 1185(a)(1) (permitting the President to impose only "*reasonable* * * * limitations" on entry).

The Government is unable to defend this clear violation. It suggested below that the Order qualifies for an exception concerning the "procedures for the processing of immigrant visa[s]," 8 U.S.C. § 1152(a)(1)(B), but that is obviously not true: The Order is a flat ban, and the fact that one of its (highly dubious) rationales is to facilitate a review of screening procedures does not change that. Nor can the Government take refuge in the fact that the Order prohibits "entry," whereas section 1152(a)(1)(A) refers to the "issuance of an immigrant visa." If the President could engage in nationality discrimination in *entry* decisions, he could circumvent the statute with ease, by discriminating at the Nation's borders rather than at its consulates. Courts do not read statutes to make them "nullit[ies]" in this way. *Dada* v. *Mukasey*, 554 U.S. 1, 16 (2008).

Finally, the Government's claim that section 1182(f) is somehow *exempt* from Congress's ban on discrimination simply repackages its argument that the President is free from the law altogether. Congress enumerated exactly which provisions it sought to exempt from section 1152(a)'s reach, including some of surpassing obscurity; section 1182(f) is not among them. *See United Dominion Indus.* v. *United States*, 532 U.S. 822, 836 (2001) (describing *expressio unius* canon). The President cannot revise the statute to say otherwise.

*3. The Order contradicts section 1182(a)(3)(B).*

That is just the beginning. As the Government freely acknowledges, the Order's purpose is to exclude aliens—all nationals of six countries and all refugees—whom the President thinks are "potential terrorists." Br. 43. But as Justice Kennedy explained in *Din*, Congress "establish[ed] *specific criteria* for determining terrorism-related inadmissibility." 135 S. Ct. at 2140 (emphasis added). In ten detailed subsections of section 1182(a)(3)(B), which "cover[] a vast waterfront of human activity," Congress specified precisely when an alien may be excluded from the country on the suspicion that he may engage in terrorism. *Id.* at 2145-46 (Breyer, J., dissenting).

This extensive enumeration was no accident. Before Congress enacted a detailed terrorism bar, the Executive frequently relied on vague accusations of terrorist affiliations as a smokescreen to exclude aliens from the country "on the basis of their expression of beliefs." H.R. Conf. Rep. No. 100-475 ("House Report"), at 162-165 (1987). In 1987, Congress sought to halt this practice by enacting a temporary rider providing that aliens could not be excluded from the country "because of any past, current, or expected beliefs, statements, or associations" unless, among other criteria, there was evidence they "ha[d] engaged" or were "likely to engage" in terrorism. Pub. L. No. 100-204, § 901(a), (b)(2), 101 Stat. 1399-1400; *see* House Report at 162-165.

In 1990, Congress repealed that stopgap measure and permanently codified the current terrorism bar. Pub. L. No. 101-649, § 601(a), 104 Stat. 5067. The drafters stated that their purpose was to displace the Executive's "vague" authority to "exclude terrorists" based on "the public interest," and "to make it clear that mere membership in an organization, some members of which have engaged in terrorist activity, does not constitute an appropriate ground for exclusion." H.R. Rep. No. 100-882, at 18-19 (1988). Congress has refined the parameters of this provision many times since, *see, e.g.*, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 411, 115 Stat. 346, but it has consistently insisted that only those who pose a proven threat, pursuant to a finely reticulated set of limits and exclusions, may be excluded as terrorists.

The Order makes a mockery of Congress's handiwork. It denies entry to millions of foreign nationals, and every refugee, on the ground that they are "potential terrorists." Br. 43; *see* Order § 1(a), (d)-(f), (i); *id.* §§ 2(c), 6(a). The President could not possibly demonstrate that all of these aliens are excludable under any provision of the terrorism bar. Nor does he try. Rather, the Order does exactly what the drafters of the terrorism bar sought to prohibit, casting aside the carefully-drawn restrictions and denying entry to aliens because they are members of a group "some members of which have engaged in terrorist activity." And it is

grim irony that the President has evidently done so for the prohibited purpose of discriminating against those aliens on the basis of their religious beliefs.

If the President could sidestep the terrorism bar in this manner, he could "effortlessly evade" any limitation in the immigration laws. *EC Term*, 550 U.S. at 434. That is why precedent dictates that "general" delegations of authority like section 1182(f) cannot be used to circumvent "specifically tailored" provisions like 1182(a)(3)(B). *Id.*; *see Marx* v. *Gen. Revenue Corp.*, 133 S. Ct. 1166, 1173 (2013). Indeed, both the D.C. Circuit (per then-Judge Ginsburg) and a panel of the First Circuit (joined by then-Judge Breyer) have specifically held that the Executive cannot invoke a broad, discretionary ground of inadmissibility like section 1182(f) to "evade" the limits Congress imposed in one of the subsections of section 1182(a). *Abourezk*, 785 F.2d at 1057-58; *see Allende*, 842 F.2d at 1118. So too here.

*4. The Order contravenes Congress's specific judgment as to whether the covered aliens are "detrimental to the interests of the United States."*

Furthermore, if there were any circumstance in which the President could exclude aliens as "potential terrorists" outside the parameters of the finely reticulated terrorism bar, this is not one. Congress has specifically considered the precise circumstance this Order is allegedly designed to confront, and has

concluded that admission of the covered aliens is not "detrimental to the interests of the United States." 8 U.S.C. § 1182(f).

In December 2015, one day after President Trump announced his plans for a Muslim ban, Congress debated exactly the question this Order purports to address: how to prevent terrorists located in countries with ostensibly poor vetting procedures from traveling to the United States. Members of Congress considered whether it was proper to exclude nationals of those countries entirely, to enhance vetting procedures, or to establish a more stringent screening process. In discussing this question, Members repeatedly examined the evidence cited in the Order, including "recent terrorist attacks" in San Bernadino and Paris, Order § 1(b)(i),[8] and the presence of "foreign fighters [in] Syria" who might seek to stage attacks "in the United States," *id.* § 1(e)(v).[9]

Ultimately, Congress addressed the issue by enacting 8 U.S.C. § 1187(a)(12). That statute does not ban anyone from entering the United States. On the contrary, it provides that persons who are nationals of or have recently traveled to two countries (Iraq and Syria) may travel to the United States *so long as they have a visa*. 8 U.S.C. § 1187(a)(12)(A). And it permits the Secretary of

---

[8] *See, e.g.*, 161 Cong. Rec. E1791 (Dec. 8, 2015) (statement of Rep. Van Hollen); *id.* at H9324 (statement of Rep. Gohmert); *id.* at H9056 (statement of Rep. Lance).
[9] *See, e.g.*, 161 Cong. Rec. at H9050 (Dec. 8, 2015) (statement of Rep. Lofgren); *id.* at H9056 (statement of Rep. Schiff); *id.* at H9054 (statement of Rep. McCaul).

Homeland Security to impose a similar requirement on additional countries thought to pose a risk of terrorist infiltration—a specific delegation the Secretary later used to exempt further countries from the Visa Waiver Program. *Id.* § 1187(a)(12)(D). As Members of Congress made plain, this statute reflects a judgment that admission of aliens from the regions of the world discussed in the President's Order are not "detrimental to the interests of the United States" so long as they are vetted through normal visa procedures. *See, e.g.*, 161 Cong. Rec. H9055 (Dec. 8, 2015) (statement of Rep. Jackson Lee).[10]

Notably, Congress specifically declined to enact a refugee ban. Legislation codifying such a ban was proposed, but Members of the House did not enact it, explaining that refugees were "victims, not perpetrators of terrorism," and that existing refugee provisions were sufficient. 161 Cong. Rec. H9035 (Dec. 8, 2015) (statement of Rep. Moulton).[11] Among other things, those provisions state that the President may set "the number of refugees who may be admitted" each year, provided that he does so "before the beginning of the fiscal year" and after engaging in a detailed "consultation" process. 8 U.S.C. § 1157(a)(1)-(3), (e); *see*

[10] *See also, e.g.,* 161 Cong. Rec. at H9056 (statement of Rep. Hoyer); *id.* at H9058 (statements of Reps. McSally and Titus).

[11] *See also, e.g.,* 161 Cong. Rec. H9050 (Dec. 8, 2015) (statement of Rep. Lofgren); *id.* at H9056-57 (statement of Rep. Schiff);

81 Fed. Reg. 70315 (Oct. 11, 2016) (setting refugee numbers for Fiscal Year 2017).

The President, evidently, disagrees with Congress's decisions. But he has not identified any information supporting his decision that Congress did not have before it when it made contrary judgments. *See* Order § 1. Nor does he try to justify his ban as "detrimental" to "interests" Congress did not consider. He simply wishes to reverse its policy, rendering section 1187(a)(12) a superfluity, and ignoring the detailed procedures for altering refugee admissions codified in section 1157(a). But Congress cannot—and did not—delegate the President the power to overturn its laws and judgments by executive fiat.

5. *The Order's dragnet ban is irreconcilable with the policies of the immigration laws.*

Finally, the Order's very approach is irreconcilable with the policies of the immigration laws. *Every* current ground of inadmissibility deems aliens inadmissible based on an *individualized* assessment of their "fitness to reside in this country." *Judulang*, 565 U.S. at 53. An alien may be excluded because she poses a health risk, 8 U.S.C. § 1182(a)(1), has engaged in criminal or terrorist activity, *id.* § 1182(a)(3)(A)-(B), or has some other individual characteristic indicating dangerousness. *See generally* 8 U.S.C. § 1182(a). But over the last five decades, Congress has not authorized the exclusion of aliens based on a statistical

inference that they belong to a group more likely than others to engage in unwanted conduct.

For this reason, courts have long concluded that conclusory generalizations based on an alien's "group" are an "impermissible basis" for the exercise of discretion absent exigent circumstances. *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.) (deeming such "invidious discrimination" a "consideration[] that Congress could not have intended to make relevant"); *see also, e.g., Chadha* v. *INS*, 634 F.2d 408, 429 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983). And courts have repeatedly applied that rule to bar restrictions on entry based on nationality in particular: In *Olsen* v. *Albright*, 990 F. Supp. 31 (D.D.C. 1997), for instance, the Government did not dispute—and the district court agreed—that it was unlawful for the Executive to adopt a policy of denying "*non*immigrant visas" to "particular individuals because of * * * the[ir] place of birth." *Id.* at 38-39 (emphasis added); *see also Bertrand* v. *Sava*, 684 F.2d 204, 212 n.12 (2d Cir. 1982) (immigration officials may not "discriminate on * * * the basis of race and national origin"); *Abdullah* v. *INS*, 184 F.3d 158, 166 (2d Cir. 1999) (same); Former Federal Immigration & Homeland Security Officials Amicus Br. 4-7, Dkt. 176.

The Order cannot be reconciled with these basic principles. Its theory is that aliens who belong to certain nationalities or who apply as refugees present a

heightened "risk" of being "potential terrorists," and so must be excluded *en masse*. Order § 1(h); Br. 43. But the Order does not attempt to make a showing that *each* alien is somehow unfit to reside in the country. Nothing in immigration law or practice countenances such a dragnet ban, and section 1182(f) should not be interpreted to allow it. *See Czyzewski*, 137 S. Ct. at 984 ("some affirmative indication" is required before courts may infer a departure from "a basic underpinning" of the statutory scheme).

Indeed, even by the standards of dragnet bans, the fit between the Order's stated justification and its scope is notably weak. The Order relies exclusively on concerns about vetting procedures and violence in Middle Eastern and North African countries, Order § 1(d), (f), but its restrictions would apply to "a Syrian national who had lived in Switzerland for decades," TRO at 37, or an individual seeking refugee status from Venezuela. And even DHS has admitted that nationality (let alone refugee status) is an "unlikely indicator" of an individual's terrorism threat. *See supra* 6; *see also* Former National Security Officials Amicus Br. 3-16, Dkt. 108. An individual's inadmissibility would thus depend on the "fortuity" of his place of birth or the application he filed, not his "fitness to reside in this country" or any connection to the concerns that allegedly motivate the

Order. *Judulang*, 565 U.S. at 53.[12] The immigration laws do not permit "the fate of a human being" to be based on such blind "conjecture." *Bridges* v. *Wixon*, 326 U.S. 135, 149 (1945).

The Government tries (Br. 2) to cloak itself in historical precedent, but no prior President has ever tried anything like this. Presidents have invoked section 1182(f) dozens of times since it was enacted in 1952.[13] As the State Department itself has explained, every proclamation before this one barred classes of aliens based either on (1) the aliens' *own* "objectionable conduct," such as committing war crimes or violating the immigration laws, 9 FAM § 302.14-3(B)(1)(b)(3) (Dec. 20, 2016); or (2) the aliens' *own* "affiliation" with a hostile or culpable entity, such as a government or country engaged in misconduct, *id.* § 302.14-3(B)(1). The Government has tried to find support in President Reagan's 1986 order suspending some Cuban immigration, but that Order was critically different: The President did not suspend Cubans because he contended they were generally dangerous or unfit to reside in the country, but because they were "affilia[ted]" with a Government

---

[12] The Order's waiver process offers no cure. An alien may obtain a waiver of the six-nation ban only if he demonstrates "undue hardship," Order § 3(c), a showing that many aliens who pose no individualized risk will be unable to make. And the Executive surely cannot engage in an otherwise unlawful and discriminatory policy simply by issuing an unreviewable promise that it will make exceptions in its sole discretion.

[13] *See* Cong. Research Serv., *Executive Authority To Exclude Aliens: In Brief* 6-10 (Jan. 23, 2017) (listing prior orders).

that had violated an immigration agreement with the United States. Proclamation No. 5517 (Aug. 22, 1986).

Indeed, the Government cannot even come up with a single statute or administrative practice analogous to the Order. Some statutes and policies have imposed information-gathering or procedural requirements based on nationality, but none of them excluded (or deported) aliens from the country on that basis. *See e.g.*, 8 U.S.C. §§ 1152(a)(1)(B), 1187(a)(12); *Rajah* v. *Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008); *Narenji* v. *Civiletti*, 617 F.2d 745, 746-47 (D.C. Cir. 1979) (per curiam). Absent a "national emergency" or other grave exigency—which, again, the President has not claimed—there is no reason a different rule should prevail here. *LAVAS*, 45 F.3d at 473 (recognizing potential exception in that circumstance).

At bottom, what the President proposes in this case is quite extraordinary. He asks this Court to permit him to use his delegated statutory power under section 1182(f) to violate clear text, evade detailed restrictions, countermand Congress's judgment, and overthrow the unbroken policy and practice of the immigration laws. If this Order is allowed, it is unclear what limit would be left. The President would have absolute discretion, and with it the capacity for "arbitrary and discriminatory enforcement" that such discretion brings. *Kolender* v. *Lawson*, 461 U.S. 352, 356 (1983).

The Framers worked to ensure that liberty received more protection than that. They gave Congress the immigration power in the hope that a "deliberate and deliberative" body would exercise it wisely. *Chadha*, 462 U.S. at 959. The Court should not lightly infer that Congress gave away that precious protection.

### C. The Order Violates the Establishment Clause.

If the President did somehow have the boundless legislative power he claims, it would then be all the more important for the judiciary to ensure that power was exercised constitutionally. Without the structural checks of congressional deliberation, the judiciary is the primary guardian of the liberties enshrined in the Bill of Rights. The Establishment Clause violation the District Court identified in this case is a powerful illustration of the importance of that judicial role.

According to the Government, however, this role is satisfied by nothing more than a cursory check that the President has offered some neutral purpose that "*could*" be behind its policy. Br. 37. It asserts that, under *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972), judicial review is limited to confirmation that the President has pasted a "facially legitimate, bona fide" rationale atop his order. But this Court has already rejected *Mandel*'s application to the Executive Order. More to the point, there is *no* standard of review under the Establishment Clause that would permit this Executive Order to stand.

*1.* Mandel *does not apply.*

In *Washington,* this Court held that *Mandel* does not apply to an *Executive* Order "promulgat[ing] * * * sweeping immigration policy." 847 F.3d at 1162 (emphasis added). For good reason. The premise of *Mandel* is that *Congress* has "plenary power to make rules for the admission of aliens." 408 U.S. at 766 (internal quotation marks omitted); *see supra* 23. As a result of that plenary power, courts have sometimes held that it is proper to subject immigration *statutes* that are alleged to violate the Constitution to only the most minimal review. *See Mandel*, 408 U.S. at 766-67 (quoting *Galvan*, 347 U.S. at 531-532).

The President, however, lacks plenary immigration authority under the Constitution. He may therefore benefit from Congress's plenary power—and the minimal judicial review it entails—only in the face of a valid delegation that implicates one of his own constitutional responsibilities. *See supra* 24. He may, for example, claim deference while "faithfully execut[ing]" an immigration statute to exclude a particular alien. Accordingly, "[a]bsent an affirmative showing of bad faith," an "executive officer's decision denying a visa that burdens a citizen's own constitutional rights is valid when it is made 'on the basis of a facially legitimate and bona fide reason.'" *Din*, 135 S. Ct. at 2140-41; *see also id.* (an officer's reason is "facially legitimate" if it "rested on a determination that [the alien] did not satisfy the statute's requirements"). But whatever deference *Mandel* may confer

on these individualized visa determinations,[14] the doctrine certainly does not apply to broad-scale Executive policymaking. *See, e.g.*, *In re Reyes*, 910 F.2d 611, 612-13 (9th Cir. 1990) (reviewing Executive Order regarding immigration without any mention of *Mandel*).

The Government's own citations bear that out: Its brief relies (Br. 34-35) on cases offering *Mandel* deference to statutes enacted by Congress, and to individualized determinations made by the Executive. But it does not cite a single case applying *Mandel* to a sweeping Executive policy of exclusion.

Indeed, the Government fails to cite a case applying *Mandel* to an Establishment Clause challenge of *any* kind. Blind deference to immigration policy in that context would be intolerable; it would leave the political branches free to employ one of the most effective means of establishing a religion—excluding non-believers. For example, colonial Virginia's use of immigration restrictions to establish the Anglican Church was so effective that, "until after the Revolution, there was no Catholic Church and there were few, if any, Catholic individuals in the Commonwealth of Virginia." McConnell, *supra*, at 2116-17.

---

[14] The Supreme Court has cast doubt on the vitality of the plenary power doctrine in general. *See, e.g.*, *Din*, 135 S. Ct. at 2136 (plurality opinion) (doubting whether "[m]odern equal protection doctrine" would permit "asymmetric treatment of women citizens in the immigration context"); *Zadyvdas* v. *Davis*, 533 U.S. 678, 695 (2001) (immigration power "is subject to important constitutional limitations.").

The risk that immigration policy will be used to establish a faith is particularly acute with respect to the Executive Branch. "Congress, in which our country's religious diversity is well represented," is unlikely to enact a statute that welcomes or excludes members of a particular faith as a means of establishing religion. *Salazar* v. *Buono*, 559 U.S. 700, 727 (2010) (Opinion of Alito, J.). Where power is concentrated in a single person, however, this structural check is absent and thorough judicial review is vital.

The Government counters (Br. 40-41) that it is backwards to apply deference to the individual visa decisions of consular officials and not to the President. But the relevant distinction is not the level at which the decision is made; *Mandel*, for example, involved a determination by the Attorney General. 408 U.S. at 769. It is the scope of the action. It would be very difficult for a rogue consular officer to establish a religion by denying entrance to non-believers case-by-case. But the President could easily accomplish that goal through a categorical policy of exclusion.

The Government's reliance (Br. 41) on presidential immunity cases is also misguided. "It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 753-54 (1982). The Court "ha[s] long held that when the President takes

official action, the Court has the authority to determine whether he has acted within the law." *Clinton* v. *Jones*, 520 U.S. 681, 703 (1997).

And the Government's cursory assertion that deference is appropriate because the excluded aliens lack Establishment Clause rights verges on the absurd. A ban on all immigrants unwilling to profess faith to the President's chosen deity would certainly violate the Establishment Clause, whether or not the individuals possess Establishment Clause rights of their own.

In the end, however, whether *Mandel* applies is an academic question. Even that doctrine permits courts to look behind "a facially legitimate and bona fide reason" for an Executive action where there is "an affirmative showing of bad faith." *Din*, 135 S. Ct. at 2141; *see Cardenas* v. *United States*, 826 F.3d 1164, 1173 (9th Cir. 2016) (challenge to an unconstitutional denial of a visa may succeed where plaintiff has "plausibly establish[ed]" bad faith). Here, the *bona fide* reason is absent, *see, e.g.*, *supra* 6 (describing DHS memo finding Order does not serve its stated purpose), while the bad faith is present in spades, *see infra* 50 (detailing President's call for a complete ban on Muslim immigration).

Courts have found the *Mandel* standard satisfied on far less evidence than this. *See, e.g.*, *Nadarajah* v. *Gonzales*, 443 F.3d 1069, 1082-83 (9th Cir. 2006) (reversing denial of parole where Executive's assertion of a national security risk was "based on facially implausible evidence"); *Wauchope* v. *U.S. Dep't of State*,

985 F.2d 1407, 1416 (9th Cir. 1993) (invalidating immigration statute that discriminated based on gender because the Government's rationale was "simply incorrect").

*2. The Establishment Clause prohibits the government from enacting policy to denigrate and burden adherents of a religion.*

While judges sometimes disagree around the edges of the Establishment Clause, there is no dispute on this: The Government may not "single[] out [religious] dissidents for opprobrium," nor may it "allocate[] benefits and burdens based on" a person's faith. *Town of Greece* v. *Galloway*, 134 S. Ct. 1811, 1826 (2014) (plurality opinion). And this fundamental prohibition on government actions that make an "enemy of any * * * creed" applies even when the Government invokes a "national security" rationale. *W. Va. State Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 637, 640 (1943). "Neither our domestic tranquility in peace nor our martial effort in war depend" on government actions that amount to "disguised religious persecution." *Id.* at 644 (Black, J. and Douglas, J., concurring).

The "historical practices and understandings" surrounding the First Amendment confirm that the Government may not adopt policies that denigrate and burden members of a particular faith in the name of national security. *Town of Greece*, 134 S. Ct. at 1819. Our Founders were familiar with the form of religious persecution born of fear. *See* McConnell, *supra*, at 2112-14 (describing acts

punishing Catholics and Puritans because of their imagined "dangers to the State"). The Religion Clauses were designed to put an end to these "old world practices and persecutions," which followed the colonists to the New World. *Everson* v. *Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 9-10 (1947). The Clauses speak in absolute terms that foreclose any policy that "classif[ies] citizens based on their religious views," *Town of Greece*, 134 S. Ct. at 1826, by using faith as a proxy for dangerousness or imposing undue burdens on followers of a stigmatized religion.

Policies that suffer from these flaws also contravene the central protection afforded by the Establishment Clause: Freedom from government conduct that coerces the adoption or renunciation of a particular faith. *See Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 523 (1993) ("The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in [the Supreme Court's] opinions.") Few actions are more likely to prompt citizens to renounce their faith or curtail their public practice than the promulgation of a government policy that disproportionately burdens that religion's followers, accompanied by explicit statements of opprobrium toward the religion itself. As Justice Jackson explained in much more dangerous times: "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters"; the First Amendment "was

designed to avoid these ends by avoiding these beginnings." *Barnette*, 319 U.S. at 641.

Because preventing religious persecution is essential to the preservation of religious freedom, judicial scrutiny for animus is not limited to a particular approach or a particular category of evidence. *See Lukumi*, 508 U.S. at 533 ("There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct."). Courts have considered everything from the statements of a priest at a display's unveiling, *McCreary Cty.* v. *ACLU*, 545 U.S. 844, 869 (2005), to the cheers of a crowd in response to legislative attacks on the burdened religion, *Lukumi*, 508 U.S. at 541. Text, operation, history, and context all may be relevant to an Establishment Clause analysis.

*3. The Order violates Establishment Clause limits.*

In this case, all of the evidence points towards an Establishment Clause violation. There can be no real question that the Order, and the numerous Executive statements concerning its purpose, broadcast a clear message of opprobrium towards Muslims. Nor can there be any doubt that the Order imposes a disproportionate burden on Muslim citizens as compared to their non-Muslim compatriots.

To take just a small sampling of the voluminous evidence in this regard: The President publicly announced a desire to favor Christians over Muslims on the very day he announced the first Order; that Order explicitly gave preference to certain refugees based on religion; and the President's advisor publicly explained two days later that the Order was intended to implement the President's promised "Muslim ban." E.R. 150-51. After the first Order was invalidated, the President's senior advisor admitted that the President sought to make only "technical" changes while achieving "the same basic policy outcome." E.R. 156. And when the President's attempt to skirt the judiciary failed, he proclaimed at an official rally that the new Order was merely a "watered down" version of the first. S.E.R. 84. There is much, much more. TRO at 10-12, 33-37; MacArthur Justice Ctr. Amicus Br. 7-15, Dkt. 62.

Meanwhile, the Order imposes a grossly disproportionate burden on Muslims. Because the Order singles out countries with overwhelmingly Muslim populations, it makes it uniquely difficult for Muslim-Americans to receive visits and reunite with their loved ones abroad. *See, e.g.*, E.R. 95-96 (Elshikh Decl. ¶ 6). Muslim-American parents must explain the Order's disparate treatment to their children, *see id.* ¶ 3, and decide whether or how to raise their families in the Muslim faith when the Government has enacted policy openly predicated on

animus toward Islam, *see* Interfaith Grp. Amicus Br. 9-10, Dkt. 121. They are marked "as outsiders" in their own country. Khan Amicus Br. 9-10, Dkt. 88.

In other words, Muslims face the injuries inflicted by religious persecution, the very harms the Founders fled. In these circumstances, any suggestion that the Order is consistent with the Establishment Clause reduces that Clause to a hollow promise of religious freedom.

*4. Defendants offer no convincing defense of the Order.*

The Government does not really deny any of this. Instead, its primary argument as to why the Order complies with the Establishment Clause's bar on acts that are "hostile" to a particular faith, *Trunk* v. *City of San Diego*, 660 F.3d 1091, 1095 (9th Cir. 2011), is that the Court must *ignore* all of the evidence demonstrating that hostility. The Constitution demands that the Court do the opposite.

a. The Government begins by insisting (Br. 46) that the Establishment Clause analysis is limited to the "text" and "operation" of the Order, both of which it claims are neutral. Even if this were true—which it is not, *see infra* 53—it would not help the Government. The text of the Executive Order itself betrays evidence of the President's focus on Islam; it uses terms negatively associated with the religion, such as "honor killings." *See* Muslim Advocates Amicus Br. 11-12, Dkt. 124. In "operation," the Order's hostility to the Muslim faith is even more

clear. Section 2's travel ban covers *only* overwhelmingly Muslim countries, while the ban in Section 6 targets refugees at a time when the leading refugee crisis involves inhabitants of Muslim-majority nations. And as described above, the fit between the Order's stated secular purpose and the scope of its ban is so poor as to raise an inference of pretext. *Lukumi*, 508 U.S. at 538-542; *see supra* 39.

The Government claims (Br. 44) that the selection of Muslim-majority countries is not probative because the Order targets only "10% of the global Muslim population." That makes no sense. Policies that overwhelmingly target a disfavored group are patently evidence of discrimination: A policy that terminated 100 employees, 95 of whom are Muslim, would raise an inference of discrimination even if other Muslim employees were not (yet) fired. *See, e.g.*, *Stormans, Inc.* v. *Wiesman*, 136 S. Ct. 2433, 2437-38 (2016) (Alito, J., dissenting from denial of certiorari) (discriminatory intent suggested where "the effect of the regulations in their real operation" meant that "the burden they impose" fell "almost exclusively on those" of particular faiths). Nor does it matter that the Order may also incidentally burden some non-Muslims. "A willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination; it simply underscores the depth of the defendant's animus."

*Pac. Shores Props., LLC* v. *City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013).

b. In any event, the Establishment Clause analysis plainly is not limited to the text and operation of the Order. The Court has made abundantly clear that the Establishment Clause is concerned with the purpose and message a policy communicates, however conveyed. *See, e.g.*, *McCreary*, 545 U.S. at 869; *Lukumi*, 508 U.S. at 540-542. A critical function of the Clause, after all, is to protect disfavored religions from being subjected to "opprobrium" that would coerce them to abandon their faith. *Town of Greece*, 134 S. Ct. at 1826. The Government offers several reasons for the Court to shut its eyes to the abundant evidence of animus in this case, but none is persuasive.

*First*, relying on a 1926 precedent from outside the Establishment Clause context, the Government asserts (Br. 46) that there is a "presumption of regularity" that attaches to the actions of the President. But however strong that "presumption," it cannot overcome the Executive's *naked statements* of an intent to discriminate based on faith. The Supreme Court has sometimes struggled to determine whether a particular religious symbol, such as the cross, is intended to communicate a religious message. *See. e.g.*, *Salazar*, 559 U.S. at 715-16. No parsing is needed here; the President and his Administration have clearly acknowledged the animus that lies behind this policy. And public statements of

the President are particularly relevant because he is typically viewed as the voice of the Government. Indeed, the Supreme Court regularly looks to the pronouncements of early Presidents to assess the extent to which the Government was permitted to endorse faith. *See, e.g.*, *Cnty. of Allegheny* v. *ACLU*, 492 U.S. 573, 671 (2014) (opinion of Kennedy, J.) (discussing the religious nature of President Washington's Thanksgiving proclamations).

*Second*, the Government warns (Br. 47) about the "pitfalls" of searching for the object of a Government action outside the confines of the policy itself. But as the District Court pointed out, no searching is required; there is nothing "veiled" about the President's purpose to exclude those of the Muslim faith. TRO at 34-35. Nor does it matter what lies in the President's "heart of hearts." The question is whether his policy and *public* statements demonstrate an object to exclude, burden, and denigrate members of that faith. They do, and the Court should not "pretend it has not seen what it has." Preliminary Injunction Op. ("PI") at 17 (Dkt. 270).

*Third*, the Government insists (Br. 49-50) on a distinction between the "official" and unofficial purpose of a policy that makes little sense in the context of an Executive Order. The Court has warned that the official stated purpose of a *statute* is the only one that matters because it is the only one to which a majority of the legislators clearly assented. *Lukumi*, 508 U.S. at 558 (Scalia, J. concurring); *but see id.* at 541 (opinion of Kennedy, J.) (relying on accounts of council meetings

in which improper Ordinances were introduced). But there is no ambiguity as to whether the President assented to his own public statements. And it is far more likely that a Muslim citizen will have heard and taken warning from the President's statements against Islam than that the same citizen will have searched for and read the text of the Order itself.

*Fourth*, the Government asserts (Br. 50-53) that even if some extrinsic evidence is informative, campaign statements are not. There is no principled reason for courts to ignore campaign statements; the Establishment Clause is sensitive to the message of condemnation that a government action conveys, and campaign statements can contribute to that message. Regardless, the policy of hostility to the Muslim faith that animates the Order is apparent even if one excludes *all* of the campaign statements. *See supra* 50 (recounting a selection of the post-inauguration evidence of discrimination). The Government's fretting that reliance on campaign statements will chill political speech and inhibit officials from altering their views once they take office also seems disingenuous when the President and his spokesmen regularly reap political capital from assertions that they are keeping "campaign promises." *See supra* 8.

*Finally*, the Government protests (Br. 53) that it made extensive alterations to the first Order to comply with the prior Ninth Circuit ruling, and that if its efforts are found wanting it would be impossible for the President to dispel the

"taint" of discrimination. These protestations ring hollow in light of the President's public acknowledgment, immediately after the current Order was enjoined, that this Order is merely a "watered down version" of the first. To remove the "taint," the Administration cannot make merely "technical" changes; it must alter the underlying policy that uses religion as a proxy for sympathy with terrorism. That is not an impossible task. A good start would be to remove the President's promise of a Muslim ban from his campaign website. The President might also seek assistance from the branch to which the immigration power is constitutionally entrusted, which would presumably not share the President's record of animus. *See Salazar*, 559 U.S. at 717 (stating that it is "Congress's prerogative to balance opposing interests and its institutional competence to do so"). At a minimum, he could engage in the administrative procedures that were formulated "as a check upon administrators whose zeal might otherwise have carried them to excesses." *United States* v. *Morton Salt Co.*, 338 U.S. 632, 644 (1950) (discussing the history of the Administrative Procedure Act).

In short, affirming the District Court's injunction will not provide an excuse for judicial second-guessing of any and every policy that might have implications for religion or immigration. It will merely prevent Executive policies that impose burdens based on impermissible religious classifications and come garbed in

explicit statements of intent to discriminate. That is nothing more than the Constitution demands.

### D. The Order Violates Due Process.

As if that were not enough, the new Order suffers from the same constitutional deficiency on which this Court's prior decision was explicitly predicated: The Order violates Due Process.

The Government claims (Br. 21) that it remedied the deficiencies this Court previously identified by limiting the scope of immigrants to whom the Order applies. Wrong. In affirming the prior injunction, this Court specifically declined the Government's request to narrow it to apply only to "lawful permanent residents" and "previously admitted aliens who are temporarily abroad now or who wish to travel and return to the United States in the future." *Washington*, 847 F.3d at 1166. That limitation, the Court held, would "leave[] out at least some who" have "viable due process claims," including "refugees" and "citizens who have an interest in specific non-citizens' ability to travel to the United States." *Id.*

The new Order suffers from the same deficiency. *Washington* pointed to the statutory procedures guaranteed to asylum seekers. *See* 847 F.3d at 1165. "[T]he Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it." *United States* v. *Barajas-Alvarado*, 655 F.3d 1077, 1084 (9th Cir. 2011). Defendants claim those procedures are inapplicable to refugees, pointing to

Congress's creation of a special program for the admission of asylum seekers who are currently abroad. But nothing in that law states that covered individuals lack the procedural rights of other asylum seekers. And in any event, the President has violated the procedures set out in that refugee statute. The statute permits the Executive to establish a cap on refugee admissions "before the beginning of the fiscal year." 8 U.S.C. § 1157(a)(2). The President ignored that requirement, and—rather than setting a cap—barred the admission of refugees wholesale. *See supra* 37.

The *Washington* Court also explained that barring the entry of non-citizens in general creates "viable due process claims" for "citizens who have an interest in specific non-citizens' ability to travel to the United States," 847 F.3d at 1166—such as a citizen whose spouse or parent is seeking admission, *Din*, 135 S. Ct. at 2139, or a university deprived of the "debates" and "discussion" provided by a visiting scholar, *Mandel*, 408 U.S. at 764. That describes Dr. Elshikh and the University of Hawaii to a T.

Finally, the Government has claimed that the waiver provisions in the new Order avoid any Due Process difficulties. That cannot be true. The prior Order also contained waiver provisions, but—despite the Government's reliance on them before this Court—that did not mean it passed constitutional muster. The revised Order offers more detail as to who "*could*" be eligible for a waiver, Order § 3(c),

but it does not guarantee appropriate process to anyone. In any event, the Government is the one that vehemently contends that consular decisions are unreviewable, and that declared its Order creates no procedural rights. It is therefore pointing to waiver provisions that it admits are thoroughly unenforceable.

**III. The Full Scope Of The Injunction Should Be Affirmed.**

Plaintiffs' likelihood of success on the merits of their claim is clear. Their ability to satisfy the remaining injunction factors is also obvious. *See* Stay Opp'n at 4-19. The Government argues, however, that the District Court's injunction is overbroad. It is not.

The Government first argues (Br. 57) that facial relief was inappropriate because the Order is "clearly lawful as applied to some aliens." That is wrong: Every application of the Order is in violation of the immigration laws and tainted by the religious animus that prompted it. *See Santa Fe Indep. Sch. Dist.* v. *Doe*, 530 U.S. 290, 313-14 (2000) (explaining that the "mere passage * * * of a policy that has the purpose and perception of government establishment of religion" warrants facial relief). Nor would confining the injunction to Plaintiffs themselves (or to confined provisions of the Order) prevent the Establishment Clause injuries they are suffering; the very existence of the challenged provisions inflicts stigmatic and spiritual harms on Plaintiffs and effects an establishment of religion in Hawaii.

The Government further contends (Br. 57-59) that the Court should only enjoin *parts* of Sections 2 and 6. But Plaintiffs have explained in detail why this is wrong. *See* Stay Opp'n at 20-23. And the Supreme Court held in *Lukumi* that even when parts of a challenged policy appear well-tailored to a secular purpose, they must nonetheless be "invalidated" where it is clear that the policy as a whole has "as [its] object the suppression of religion." 508 U.S. at 540.

Moreover, as the District Court noted, the Government "fail[ed] to provide a workable framework for narrowing the scope" of the injunction. PI at 22. That is likely because the different components of Sections 2 and 6 are inextricably linked. The provisions of Section 2 the Government wishes to exempt are designed to help the President *extend* his discriminatory ban on entry to additional countries for additional periods of time. Likewise, all the provisions of Section 6 are components of an integrated process for suspending and reviewing refugee admissions.[15] And there is nothing to the notion that the injunction would preclude Executive Branch consultation or policy reform; these activities are not limited except to the extent they occur as part and parcel of enforcing the Muslim ban. *See Lukumi*, 508 U.S. at 540. Indeed, while the first Order was enjoined, during the

[15] The Government's contention that an injunction may not be issued directly against the president was never raised below and is waived. Anyway, "injunctive relief against executive officials like" cabinet Secretaries is "within the courts' power," and Plaintiffs' injuries can be redressed that way. *Franklin* v. *Massachusetts*, 505 U.S. 788, 802-803 (1992).

pendency of the current injunction, the Executive implemented increased vetting procedures worldwide. *See* S.E.R. 67-71.

Finally, as the Government barely denies, nationwide injunctive relief was appropriate. "[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166-67 (citing *Texas*, 809 F.3d at 187-188). Nor has the Government made any serious proposal to limit the injunction geographically in a way that would still remedy the harms inflicted on Plaintiffs.

**CONCLUSION**

The District Court's preliminary injunction should be affirmed.

Respectfully submitted,

/s/ Neal Kumar Katyal

DOUGLAS S. CHIN
Attorney General of the State of Hawaii
CLYDE J. WADSWORTH
Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA
DONNA H. KALAMA
KIMBERLY T. GUIDRY
ROBERT T. NAKATSUJI
Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500

*Counsel for the State of Hawaii*

NEAL K. KATYAL
COLLEEN ROH SINZDAK
MITCHELL P. REICH
ELIZABETH HAGERTY
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Email: neal.katyal@hoganlovells.com

THOMAS P. SCHMIDT
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

SARA SOLOW
ALEXANDER B. BOWERMAN
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

There are currently no related cases within the meaning of Ninth Circuit Rule 28-2.6. This case would have been related to *Washington* v. *Trump*, No. 17-35105, 847 F.3d 1151 (2017) (*per curiam*), but this Court granted Appellants' unopposed motion for voluntary dismissal of that appeal on March 8, 2017. The *Washington* appeal involved a challenge to Executive Order No. 13,769 (Jan. 27, 2017). That Order was revoked and repealed by Executive Order No. 13,780 (Mar. 6, 2017). Executive Order No. 13,780 is the subject of this case.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 21, 2017. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal